No. 28,443.

The State of Kansas, *Appellee*, v. General Sheppard, *Appellant*.

(271 Pac. 298.)

Opinion filed November 3, 1928.

*H. S. Hines,* of Arkansas City, and *A. W. Martin,* of Pittsburg, for the appellant.

*William A. Smith,* attorney-general, *Roland Boynton,* assistant attorney-general; *H. V. Howard,* county attorney, and *George McNeish,* deputy county attorney, for the appellee.

The opinion of the court was delivered by

Burch, J.: General Sheppard was convicted of having a narcotic in his possession, and appeals. He contends the evidence did not establish possession, as defined in the opinion in the case of *State v. Metz,* 107 Kan. 593, 193 Pac. 177.

Sheppard lived on West Chestnut avenue, outside the city limits of Arkansas City. Maggie Crawford, the wife of another man, lived with him. Sheppard and the woman engaged in a fight, and were arrested. At the time of the arrest, the woman said narcotics were planted by a tree northwest of the house. Sheppard and the woman were placed in jail, and an officer returned to Sheppard's house and searched for narcotics, but found none. Soon after Sheppard was placed in jail, Jim Price remembered be owed Sheppard $2.50, and went to the jail to pay Sheppard. Price had a conversation with Sheppard, which Price, as a witness for the state, related:

"Q. What did he say? A. He asked me to go out to the place—told me just exactly, that is, just right by the yard . . . to see if the law had been there and found his stuff.

"Q. Did he tell you what the stuff was in? A. Yes, sir; it was buried there —I could find it easy by the signs—looked like chickens had been scratching.

"Q. Did he tell you what it was in? A. Told me it was in a bottle.

"Q. Whereabouts did he tell you you would find it from the bodock tree? A. Told me I would find it before I got to the bodock tree in the gutter—he didn't say how far.

"Q. What did you say to him? A. I told him I didn't want to go; he says he was just asking for me to go out there to see if the law had found it.

"Q. Did he tell you it was under a brick? A. No; he didn't say positive; he said it was near a brick.

"Q. Near a brick? A. Yes, sir.

"Q. He mentioned a brick? A. Yes; he told me."

Price left the jail, did a little janitor work, and then went out on West Chestnut to Sheppard's place. Price gave the following account of what occurred there:

"Q. After you got out there what did you do—what happened? A. After I got out there I began to look for this stuff. I seen a car setting west of the railroad there, about a couple of hundred yards, something like that, and I didn't get interested in looking for it on account of this car. I didn't know who it was in it; I didn't want to let any one see me.

"Q. Tell what you did. A. I looked for the stuff, but I didn't find it.

"Q. What did you do then? A. I first kicked around with my foot; after that I raked around with my hand.

"Q. Did anything happen while you were doing this? A. Yes, sir; the officers ran in on me.

"Q. What did you do then? I got up and walked off when I seen the car coming; I didn't see who it was, and I started to walk.

"Q. Where did you go? A. Started up towards the house; when they seen me they just jumped out of the car and had me to come back to them.

"Q. What conversation did you have with the officers, and what happened? A. They asked me what I was doing out there. I told them I was out there to see Sheppard. Speedy says, you are a liar.

"Q. Did you get hit out there? A. Yes, sir.

"Q. You first lied about it, did you? A. Yes, sir.

"Q. Where did you get hit? A. Right up over the eye.

"Q. What hit you? A. A black-jack.

"Q. Did you tell him this story after that? A. I told him my business out there; I told him I was out looking for stuff—Sheppard sent me out to see about it.

"Q. What did you do after that? A. I didn't do nothing but sit there and hold my wounded place.

"Q. Did you get in the car? A. Yes, sir.

"Q. Where did the officers go? A. One of them stood at the car and one was over looking in the gutter for this stuff, and which he found it.

"Q. Who was looking for the stuff? A. Dewey.

"Q. Was there any other officers there looking for it? A. I can't remember whether Morey was looking for it at that time or not; he was still nearby.

"Q. Did anybody find anything? A. Yes, Dewey found it.

"Q. Did you see him when he found it? A. Yes, sir.

"Q. You didn't tell them anything about this until they had hit you on the head? That is right? A. That's right."

The bottle which the officer found contained morphine sulphate, a derivative of opium. Price testified he had been around dope fellows and heard what they said, and they would be apt to call morphine "stuff."

Taking into account the fact that the narcotic was contraband, the fact that it was kept at a place near Sheppard's home which he described with particularity, the fact and manner of concealment of the bottle, Sheppard's claim of ownership—"my stuff"—and Sheppard's anxiety concerning possible discovery by the officers after the angry woman had turned informer, all the elements of corporeal possession were well proved.

The court is not concerned with credibility of witnesses nor conflicts in testimony, nor with interpretations of the evidence which the jury did not accept, such as that Sheppard was the innocent victim of a conspiracy.

Defendant complains the instruction given the jury respecting possession was incomplete, and dealt with constructive possession rather than possession in fact. The instruction is not recommended for insertion in a form-book, but defendant was willing to go to the jury without suggesting to the court wherein it might be improved, and it is now too late to complain.

Other criticisms of the proceedings reveal nothing prejudicial to defendant's substantial rights.

The judgment of the district court is affirmed.